**UNITED STATES of America,**

v.

**Tracy LAHEY, et al., Defendants.**

**Case No. 10–CR–765 (KMK).**

United States District Court,
S.D. New York.

Aug. 8, 2013.

---

Timothy Sini, Esq., Jeffrey Ehrlich Alberts, Esq., Anna Margaret Skotko, Esq., U.S. Attorney's Office, SDNY, New York & White Plains, NY, for the Government.

Paul Rinaldo, Esq., Grossman & Rinaldo, Forrest Hills, NY, for Defendant Robert Santiago.

Theodore Samuel Green, Esq., Green & Willstatter, White Plains, NY, for Defendant Walter Tarrats.

### OPINION AND ORDER

KENNETH M. KARAS, District Judge:

On August 26, 2010, a Grand Jury returned a sealed Indictment charging Defendants with committing various narcotics and firearms crimes. (Dkt. No. 2.) Several days later, law enforcement officials arrested Defendants Robert Santiago ("Santiago" or "Comanche") and Walter Tarrats ("Tarrats") (collectively, "the Moving Defendants"), along with several others, and executed warrants to search multiple residences, including those associated with the Moving Defendants. The searches yielded physical evidence, including weapons and gang related paraphernalia. On August 2, 2011, the Government filed a Superceding Indictment. (Dkt. No. 53.) The Moving Defendants have moved to dismiss the Superceding Indictment as to them and/or to suppress the physical evidence from their residences. The Court denies Santiago's Motion in its entirety. The errors that Santiago has identified in the Government's presentation to the Grand Jury and in the search warrant affidavit are not prejudicial or material. Tarrats's Motion is granted insofar as he seeks suppression, but denied insofar as he seeks dismissal of the Superceding Indictment.[1]

### I. Background

#### A. Factual History

This case is the result of an eighteen-month undercover operation conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Starting in March 2009, an ATF undercover agent ("the UC") infiltrated the Pagans Outlaw Motorcycle Club ("the Pagans"). (Mem. of Law of the U.S. in Opp'n to Defs.' Pretrial Mots. 5 (Dkt. No. 84).) While in role, the UC at times carried an audio recorder, which he used to capture events relevant to ATF's investigation of the Pagans. (*See* Post Hr'g Mem. of Law of the U.S. in Opp'n to Defs.' Mots. To Suppress Evidence ("Gov't Mem.") 4 & n. 1 (Dkt. No. 145).) Due to safety concerns, the UC could not break role during the investigation, and he accordingly had to convey information, including audio recordings, to other ATF agents, who were preparing the case against Defendants.[2] When the time came for the Government to present its case to the Grand Jury for an indictment and, later, to submit affidavits in support

---

1. Several additional pre-trial issues are currently before the Court. The Court addresses the Moving Defendants' arguments which are similar or related to their *Franks* arguments in this Opinion. The Court addresses Defendant Tarrats's and Defendant Davis's Motions To Dismiss Count Eleven of the Superceding Indictment in a companion Opinion.

2. Indeed, when the UC was arrested for possession of a firearm during his time as a Pagans Member, the ATF apparently did not inform the arresting police department, the Suffolk County Police Department, that the UC was a federal agent. (Hr'g Tr. 97–98, Oct. 1, 2012.)

of search warrants, the UC was still in role, and other ATF agents, including Special Agent Brian DiGirolamo, who was the case agent for the investigation, and Special Agent Robert Grunder, were responsible for performing these tasks. (*See* Hr'g Tr. 26–27, Oct. 1, 2012.)

On August 26, 2010, following testimony by Special Agent DiGirolamo, a Grand Jury returned an Indictment under seal, charging seven individuals, including the Moving Defendants, with participating in a conspiracy to distribute narcotics from at least 2009 through in or about 2010, and with various firearms crimes. (Dkt. No. 2.) On September 13, 2010, Special Agent Grunder submitted an affidavit in support of a search warrant for premises associated with Defendant Santiago ("the Santiago Affidavit"), (Gov't Ex. 201 ("GX 201")), and, the next day, Special Agent DiGirolamo submitted an affidavit in support of a search warrant for certain premises and properties associated with other Defendants, including Defendant Tarrats ("the Tarrats Affidavit"), (Gov't Ex. 3502–G ("GX 3502–G")), (collectively, "the challenged affidavits"). Magistrate judges in various federal districts in New York, New Jersey, and Maryland issued these two and several other search warrants, and, on September 15, 2010, ATF agents executed them, arresting Defendants and seizing contraband at their residences. Special Agent DiGirolamo, as the case agent, was primarily responsible for preparing the various search warrant affidavits, including those that he did not personally swear out. (*See* Hr'g Tr. 19–21, 157, Oct. 1, 2012.) Special Agent DiGirolamo explained that in preparing the affidavits, he relied on his discussions with the UC, reports prepared by Special Agent Kotchian that documented information relayed by the UC, ("the Kotchian Reports"), and his own review of the UC's audio recordings. (*See id.* at 20–21, 30, 119.)

The challenged affidavits describe, among other things, a party held at Defendant Lahey's property on May 22, 2010 in Swan Lake, New York ("the Lahey Party")—which party the UC attended, pretending to be a Pagans Member. The Moving Defendants' arguments in support of dismissal and suppression are largely based on alleged discrepancies between the Governments' *description* of various aspects of the Lahey Party—the sequence of events, the nature of the party, the Moving Defendants' activities during the party, etc.—and the *actual* aspects of the party, as revealed by the UC's partial audio recordings from May 22, 2010. In the challenged affidavits, which are identical in most respects, the Government affiants offered the following allegations regarding the Lahey Party:

9. According to the UC, members of the Pagans frequently gathered for meetings and/or parties, and purchased, used, and distributed narcotics, including, among others, cocaine, crack cocaine, amphetamines, prescription medications, and marijuana, during those gatherings. The Pagans members sometimes purchased narcotics from the members of other outlaw motorcycle gangs, including the Mongols....

. . .

11. According to the UC, on or about May 22, 2010, the UC attended a Pagans gathering at the residence of TRACY LAHEY in Swan Lake, New York, and where numerous other members of the Pagans were present, including, among others: CUEVAS, LAHEY, YOUMANS,[3] BLAIR,[4] TARRATS, and LEGG. According to the UC, the follow-

---

3. AKA "Doc"

4. AKA "Roadblock"

ing events occurred during the gathering:

a. [Doc] told the UC that members of the Mongols Outlaw Motorcycle Gang would be coming to the party and would be bringing cocaine to sell. [Doc] asked the UC if the UC wanted to purchase some cocaine. The UC told [Doc] that he/she wanted to buy an "eight ball" and two 1–gram bags of cocaine. [Doc] told the UC that he would let the UC know the price for the cocaine.

b. [Doc] also showed the UC multiple firearms that were located inside LAHEY's residence, including a shotgun with a shortened barrel above the front door of the Residence; a shotgun with a shortened barrel inside a bedroom of the Residence; a High–Point 9 millimeter rifle; and a small caliber handgun in LAHEY's waistband, among others.

c. That afternoon, [Doc] and [Roadblock] arranged for a security assignments [sic] for the Pagans gathering. The UC saw [Doc] put a High–Point rifle in the front seat of a pick-up truck located at one of the two security checkpoints, and [Doc] told the UC that a second rifle was placed at the second security check-point.

d. [Doc] assigned the UC and another Pagans member to conduct security at the two security check-points from noon to 3:00 pm.

e. At approximately 3:00 p.m., TARRATS and LEGG replaced the UC and the other Pagans member at the respective security check-points. The UC told LEGG that the High–Point rifle was placed in the front seat of the pick-up truck. During the course of the afternoon, the UC observed LEGG and TARRATS at both security check-points and saw them alternate security checkpoints.

f. Later that afternoon, members of the Mongols Motorcycle Club arrived at LAHEY's residence, and the UC was introduced to "Comanche," the president of the Mongols Upstate New York Chapter, who was later identified as [Santiago].

g. SANTIAGO arrived at LAHEY's residence with a woman who was carrying a bag. The woman was identified to the UC as SANTIAGO's "old lady" (i.e., his girlfriend or wife). The UC also saw SANTIAGO get out of his car carrying an object wrapped in what appeared to be a t-shirt. SANTIAGO walked into the porch area of LAHEY's house and removed a shotgun with a shortened barrel from the t-shirt. SANTIAGO showed [Doc] the sawed-off shotgun. SANTIAGO, [DOC], LAHEY, and the woman accompanying SANTIAGO went into a bedroom in the house and closed the door.

h. A short time later, [Doc] and LAHEY left the bedroom and [Doc] approached the UC. [Doc] told the UC that the eight-ball of cocaine would cost $150 and each 1–gram bag of cocaine would cost $50. The UC handed [Doc] $250 in cash, and saw [Doc] hand that money to LAHEY. The UC subsequently observed LAHEY hand an amount of cash to SANTIAGO.

i. Approximately 45 minutes later, [Doc] asked the UC if LAHEY had given the UC cocaine, and the UC responded that LAHEY had not. The UC then saw [Doc] speak to LAHEY. Within a few minutes, LAHEY approached the UC and asked the UC to come to LAHEY's bedroom. As the UC and LAHEY entered the bedroom, SANTIAGO walked out of the bedroom.

j. When the UC entered the bedroom, the UC saw a large quantity of [cocaine] on a table.... The woman who arrived

with SANTIAGO and another woman were seated at the table cutting and packaging the cocaine into small green plastic bags....

(GX 3502–G ¶¶ 9, 11 (footnote omitted); *see also* GX 201 ¶¶ 10–11.) The Santiago Affidavit contains an additional allegation describing a conversation between the UC and Doc regarding the Lahey Party:

According to the UC, on or about May 29, 2010, [Doc] approached the UC and asked the UC if he liked the cocaine that he/she had purchased at LAHEY's residence the previous weekend. [Doc] told the UC that [Santiago] had provided the cocaine sold at LAHEY's residence that weekend. [Doc] also told the UC that [Santiago] wanted to sell more "weight" and asked the UC if the UC would be interested in selling cocaine with [Doc.]

(GX 201 ¶ 12.)

### B. Procedural History

After reviewing the discovery in this case, including the UC's partial audio recordings, the Moving Defendants filed Motions, urging the Court, among other things, to suppress physical evidence, arguing that the challenged affidavits do not establish probable cause and present a misleading description of the Lahey Party. In the alternative, the Moving Defendants requested a *Franks* hearing. On July 25, 2012, this Court held that the Moving Defendants had made a "substantial preliminary showing," both that the Government's affiants had made false statements "with

reckless disregard for the truth," in their applications for warrants to search the Moving Defendants' residences, and that the statements potentially had been "necessary to the [magistrate judges'] finding[s] of probable cause," *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). (*See* Hr'g Tr. 51, July 25, 2012.) The Court accordingly conducted a so-called *Franks* hearing on October 1 and 24, 2012 to resolve the alleged discrepancies between the description of criminal conduct included in the search warrant affidavits and other evidence of the events described in the affidavits. At the hearing, the primary witnesses were Special Agents DiGirolamo and Grunder, who both offered testimony on the investigation generally and the events of the Lahey Party in particular. (*See* Hr'g Tr. Oct. 24, 2012; Hr'g Tr. Oct. 1, 2012.)

At the conclusion of the hearing, the Court set a briefing schedule for the Parties. The Moving Defendants made their submissions, arguing that there are deliberate and/or reckless misrepresentations and omissions in the affidavits and that the remaining/corrected content is "insufficient to establish probable cause," thus requiring that "the search warrant[s] ... be voided and the fruits of the search excluded." *Franks,* 438 U.S. at 156, 98 S.Ct. 2674. The Moving Defendants also urged that the case against them should be dismissed. The Court heard oral argument on April 30, 2013.[5]

---

5. In his most recent *pro se* submission, Defendant Santiago points out that this case has been pending for over two years, and requests prompt resolution of the instant Motions. The Court notes, however, that it has granted the Parties several extensions and adjournments, and has accepted numerous additional submissions, including multiple *pro se* submissions from Defendant Santiago and surreplies from each Party. Moreover, at the

conclusion of oral argument on April 30, 2013, the Court requested supplemental briefing on an issue that had been largely ignored by the Parties: the legal standard for reckless omissions in the context of a motion to suppress pursuant to *Franks.* The Parties submitted briefs on this issue in May, but then, on June 24, 2013, the Second Circuit issued *United States v. Rajaratnam,* 719 F.3d 139 (2d Cir.2013), a decision in which the Circuit

## II. Discussion

### A. Motions To Dismiss

#### 1. Standard of Review

The Moving Defendants face a heavy burden in arguing that the Superceding Indictment should be dismissed due to the Government's misconduct. "To establish a due process violation on this ground, a defendant must show that the government's conduct is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction. This is a very heavy burden in light of [the] well-established deference to the Government's choice of investigatory methods." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir.2011) (citations and internal quotation marks omitted). Examples of unconstitutional outrageous conduct include "coercion" or violation of the defendant's "person"; "feigned friendship, cash inducement, and coaching in how to commit the crime[, however,] do not constitute outrageous conduct." *Id.* Also, "[a] court may 'dismiss an indictment because of misconduct before the grand jury,'" where the government's misconduct compromised the "'integrity of the grand jury's functions.'" *United States v. Koschtschuk*, No. 09–CR–0096, 2011 WL 3295817, at *3 (W.D.N.Y. Aug. 1, 2011) (quoting *United States v. Williams*, 504 U.S. 36, 46, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992)). But a court may not dismiss an indictment based on prosecutorial misconduct "absent a finding that [defendants] were prejudiced by such misconduct." *Id.* (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)).

#### 2. Santiago's Motion

In several *pro se* submissions, Santiago argues that the Court should dismiss the Superceding Indictment as to him, because the Government engaged in outrageous misconduct. Santiago's long-hand submissions reflect an impressive effort, but do not carry the day.

First, Santiago claims that the Government presented inaccurate information to the Grand Jury regarding the timing of a conversation between Doc and the UC about the price of drugs, relative to the timing of the Mongols' arrival at the Lahey Party. On August 24, 2010, Special Agent DiGirolamo testified to the Grand Jury that Doc "had to wait until the Mongols showed up to get a price for the drugs" for the UC. (Gov't Ex. 3502–A ("GX 3502–A"), at 22–23, Aug. 24, 2010; *see also id.* at 24 ("Q: Now *after Santiago arrived,* did there come a time when [Doc] informed [the UC] of how much the drugs were going to cost? A: Yes." (emphasis added)).) The Parties agree that the specific arrival of the Mongols was not recorded, but in at least one of his *Franks* exhibits and in his hearing testimony, Special Agent DiGirolamo stated that Santiago arrived at the Lahey Party between 2:45 and 3:48 pm. (Gov't Ex. 601, at 3 (SA DiGirolamo's chart); Hr'g Tr. 77, Oct. 1, 2012 (SA DiGirolamo's testimony).) Santiago points out that the Government's theory thus conflicts with the audio recordings from May 22, 2010, which document Doc's quoting a price for drugs to the UC at 2:05 p.m., (*see* Gov't Ex. 501, Session 9, at 26 ("He said it's $50 a gram")) [6]—at least

established the controlling standard for reckless omissions in the context of *Franks* suppression motions. In other words, *Rajaratnam* conclusively resolved the issue for which the Court had requested additional briefing. The Court thus was required to consider the instant Motions under the legal standard announced in *Rajaratnam*—a decision about which the Court has heard nothing from the Parties.

6. Government Exhibit 501 is a collection of the Government's modified transcripts of the

forty minutes prior to the Mongols' arrival as described by Special Agent DiGirolamo at the *Franks* hearing.[7]

One possible explanation for this discrepancy is that, in Government Exhibit 601 and in his testimony at the *Franks* hearing, Special Agent DiGirolamo simply misstated the timing of the Mongols' arrival at the Lahey Party. There is some evidence in the record, including another exhibit prepared by Special Agent DiGirolamo for the *Franks* hearing, which documents that Santiago and the other Mongols could have arrived as early as just after 2:00 p.m. (*See* Gov't Ex. 3502–OO, at 3 (Special Agent DiGirolamo's *Franks* table of events, documented by time and recording session, which states that Santiago and the Mongols arrived between 2:08 and 3:48 p.m.).)[8] And it seems more likely that Special Agent DiGirolamo unintentionally gave incorrect testimony regarding the timing of the Mongols' arrival at the Lahey Party to the Court during the *Franks* Hearing than that he intentionally gave incorrect information on this matter to the Grand Jury. But even if Special Agent DiGirolamo did give incorrect information to the Grand Jury regarding the timing of Doc's quoting a price for the cocaine relative to the timing of the Mongol's arrival—i.e., even if Doc actually quoted a price for the drugs before the Mongols arrived, and Special Agent DiGirolamo testified to the contrary—the rec-

ord clearly establishes that, independent of when he knew the price of the cocaine, Doc was describing cocaine that was arriving with the Mongols. (*See* Gov't Session 9, at 10 ("[W]hen you see the Mongols coming, that's when [your cocaine is] coming.").) And given this evidence, as well as the other evidence strongly suggesting that Santiago brought the cocaine to the Lahey Party, discussed below, any error Special Agent DiGirolamo made in describing when Doc quoted a price of the drugs to the UC relative to the timing of the Mongols' arrival was not prejudicial, let alone outrageous.

Second, Santiago argues that Special Agent DiGirolamo gave misleading testimony to the Grand Jury regarding the shotgun that was seized from Santiago's residence. It bears noting that the Santiago Affidavit includes an allegation that the UC observed Santiago arrive at the Lahey Party with a sawed-off shotgun. (*See* GX 201 ¶ 11(d).) In testimony before the Grand Jury on August 26, 2010, Special Agent DiGirolamo described that, at some point during the Lahey Party, the UC was able to measure that shotgun against his own arm; Special Agent DiGirolamo further testified that the UC reported that the length of the gun was, by that measure, slightly shorter than eighteen inches. (Gov't Ex. 3502–B, at 3–4, Aug. 26, 2010.) In subsequent Grand Jury

---

UC's audio recordings from May 22 and 29, 2010. (*See* Hr'g Tr. 34–35, Oct. 1, 2012 (Special Agent DiGirolamo's *Franks* testimony regarding the creation of the transcripts).) The Court will hereinafter cite the transcripts by the Government Session number followed by a page pincite.

7. Even if, as the Government now argues, the recorder was slow by approximately seven minutes, (Gov't Mem. 27; *see also* Hr'g Tr. 64, Oct. 1, 2012), this recording demonstrates that Doc knew the price of the drugs at 2:12 p.m. at the latest—thirty minutes prior to the

Mongols' arrival, as described by Special Agent DiGirolamo at the *Franks* hearing.

8. Indeed, the Government previously acknowledged the possibility that Santiago and his companions arrived as early as 2:00 p.m., and that he was *identified* to the UC at that point, but the two were *introduced* later in the afternoon. (*See* Hr'g Tr. 35–36, 48–50, Apr. 3, 2012 (discussions between the Court and AUSA Skotko, in which she described that the Mongols arrived potentially one or two hours prior to the UC's introduction to Santiago).)

testimony on August 2, 2011, Special Agent DiGirolamo was asked whether, "according to the undercover's impression, ... the shotgun recovered from Santiago's residence appear[ed] [and] look[ed] similar in appearance, to the shotgun that was possessed by Santiago on or about May 22, 2010, at Lahey's residence in Swan Lake," (2d Post Hr'g Mem. of Law of the U.S. in Opp'n to Defs.' Mots. To Suppress Evidence & To Dismiss the Indictment ("Gov't 2d Mem.") 8–9 (quoting unproduced Grand Jury testimony) (Dkt. No. 159)); Special Agent DiGirolamo answered that, according to the UC, the guns were similar in appearance, (*id.* at 9).

Santiago argues that this latter testimony was misleading, because the sawed-off shotgun recovered from his shed was over thirty inches in length, (*id.* at 9), and thus it could not have appeared or looked similar to the gun that Santiago allegedly possessed at the Lahey Party. Santiago may, of course, argue at trial that the gun recovered from his shed was not the gun that he brought to the Lahey Party— indeed, he may argue that he did not bring a gun to the Lahey Party at all—but he has not demonstrated that Special Agent DiGirolamo's statement on August 2, 2011 regarding the UC's impression of the two shotguns was false, let alone that Special Agent DiGirolamo's statement as to the UC's impression was outrageous or prejudicial.

■ Third, Santiago argues that Special Agent Grunder engaged in outrageous misconduct by swearing out the Santiago Affidavit, because Special Agent Grunder had not prepared that affidavit, and he accordingly lacked personal knowledge of the information contained in it.[9] As noted, the Parties agree that Special Agent DiGirolamo, the case agent, actually drafted the Santiago Affidavit. Indeed, Special Agent Grunder testified at the October 24 *Franks* hearing that he merely signed off on it. (Hr'g Tr. 9, Oct. 24, 2012; *see also* Hr'g Tr. 25–26, 157, Oct. 1, 2012). But Special Agent Grunder also testified that he received information about the investigation from Special Agent DiGirolamo and the UC, (Hr'g Tr. 13–14, Oct. 24, 2012), and Special Agent DiGirolamo had previously testified that he based his information on communications with the UC, the Kotchian Reports, and the audio recordings, (Hr'g Tr. 20, 27, 29–31, 33 Oct. 1, 2012). In light of this testimony, the Court can find no fault in the fact that Special Agent Grunder swore out the Santiago Affidavit, relying on information relayed to him by other ATF agents, their reports, and audio recordings. *See United States v. Garcia*, 413 F.3d 201, 213 (2d Cir.2005) ("It is entirely reasonable and responsible for law enforcement officers, in performing their day-to-day duties, to rely on the collective knowledge of their colleagues."); *cf. United States v. Cruz*, 834 F.2d 47, 51 (2d Cir.1987) (noting in the arrest context that "[t]he determination of whether probable cause ... exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts [where] the various law enforcement officers in [the] investigation were in communication with each other").

Santiago's remaining arguments do not merit extended discussion. He offers several arguments that track his *Franks* arguments, the substance of which are addressed below. He claims that Special Agent DiGirolamo's testimony at the *Franks* hearing that the UC turned on his recording device after giving the money to Doc for cocaine, (Hr'g Tr. 78–80, Oct. 1,

9. Santiago offers this as both an outrageous conduct argument and as an argument in support of suppression pursuant to the *Franks* hearing.

2012), was false, because there is a recording of that transaction, (Gov't Session 9, at 27). It appears from the recording that the UC may have given Doc some money at around 2:05 p.m., when the recorder was on, (*see id.* (documenting the UC saying to DOC "Let me know when you want the *other* uh, cash" (emphasis added))), and the balance later, at approximately 3:45 p.m., when the recorder was off, (Gov't Mem. 9; Hr'g Tr. 79–80, Oct. 1, 2012). But when the UC gave money to Doc is immaterial, and any inconsistencies between Special Agent DiGirolamo's testimony at the *Franks* hearing and the audio recordings are not outrageous.

Santiago also claims that the recording from May 29 reveals that he was not the Mongols member who brought drugs to the Lahey Party, because in that recording, Doc asks the UC "did I ever tell you about the Mongols that brought that shit *up* that day," (Gov't Session 5, at 1 (emphasis added)), and Santiago's residence is north of Lahey's. This argument is a nonstarter; Doc may have used "up" imprecisely, or Santiago may have traveled from some place other than his residence. But it is not a stretch to say that there is nothing outrageous about this statement.[10]

## B. Motions To Suppress Pursuant to Franks

### 1. Standard of Review

■ Law enforcement officers executed searches of the Moving Defendants' residences pursuant to search warrants issued by magistrate judges. It is well established that courts must afford a "presumption of validity ... to the affidavit[s] supporting ... search warrant[s]." *United States v. Martin,* 426 F.3d 68, 73 (2d Cir. 2005) (internal quotation marks omitted). Consequently, a criminal defendant may

challenge the validity of a search warrant—as the Moving Defendants do here—only in specific circumstances, including where he or she makes a substantial preliminary showing that there are intentional or reckless, material misrepresentations or omissions in the underlying search warrant affidavit. *See Southerland v. City of New York,* 681 F.3d 122, 126–27 (2d Cir. 2012) (explaining the two-part preliminary showing—intent and materiality—defendant must make to merit a *Franks* hearing); *Martin,* 426 F.3d at 73 (same). The Moving Defendants made this preliminary showing, and the Court held a hearing to address the alleged errors in the challenged affidavits.

■ "[E]very statement in a warrant affidavit does not have to be true." *Martin,* 426 F.3d at 73 (internal quotation marks omitted); *see also United States v. Canfield,* 212 F.3d 713, 717 (2d Cir.2000) (same). "All storytelling involves an element of selectivity," and it is therefore not necessarily constitutionally significant that an affidavit "omit[s] facts which, in retrospect, seem significant." *United States v. Vilar,* No. 05–CR–0621, 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks omitted). Furthermore, it would be unreasonable to require an affiant "to include ... every piece of information gathered in the course of an investigation." *United States v. Awadallah,* 349 F.3d 42, 67–68 (2d Cir.2003) (internal quotation marks omitted); *see also Rajaratnam,* 719 F.3d at 153–54 (same). Therefore, courts evaluate motions under *Franks* to an exacting standard—especially where, as here, a defendant primarily alleges that there are omissions, as opposed to misrepresentations, in the search warrant affidavit. *See United States v. Dupree,* 781 F.Supp.2d 115, 144 (E.D.N.Y. 2011) (" 'The *Franks* standard is a high

---

**10.** The Court addresses Tarrats's arguments for dismissal below.

one.' " (quoting *Rivera v. United States,* 928 F.2d 592, 604 (2d Cir.1991))); *Vilar,* 2007 WL 1075041, at *27 (collecting authority for the proposition that *Franks* claims based on omissions are less likely to justify suppression than claims based on intentionally or recklessly false assertions). To require suppression, a movant must demonstrate, by a preponderance of the evidence, both the affiant's *intent* to mislead the issuing judge and the *materiality* of the affiant's falsehoods or omissions. *See Rajaratnam,* 719 F.3d at 145–46 (discussing two-prong *Franks* showing); *see also Southerland,* 681 F.3d at 126–27 (same); *Martin,* 426 F.3d at 73 (same); *Canfield,* 212 F.3d at 717 (same).

■ With respect to the intent requirement, the Moving Defendants bear the burden of demonstrating that the misrepresentations or omissions in the search warrant affidavits were "the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield,* 212 F.3d at 717–18. "The determination of 'whether a person acted deliberately or recklessly is a factual question of intent.' " *United States v. Williams,* 758 F.Supp.2d 287, 299 (S.D.N.Y.2010) (brackets and ellipsis omitted) (quoting *United States v. Trzaska,* 111 F.3d 1019, 1028 (2d Cir. 1997)), *rev'd on other grounds,* 681 F.3d 35 (2d Cir.2012).

■ As courts within the Second Circuit have observed, the standard for an intentional misrepresentation or omission is clearer than the standard for a reckless misrepresentation or omission. *See Vilar,* 2007 WL 1075041, at *26 (" 'The meaning of an intentional falsehood is self-evident,' but the definition of 'reckless disregard' in the *Franks* context is less clear." (citation omitted)); *United States v. Kunen,* 323 F.Supp.2d 390, 395 (E.D.N.Y.2004) (same). "The Supreme Court in *Franks* did not define the term 'reckless disregard' other

than to state that 'allegations of negligence or innocent mistake are insufficient.' " *United States v. Rajaratnam,* No. 09–CR–1184, 2010 WL 4867402, at *8 (S.D.N.Y. Nov. 24, 2010) (brackets omitted) (quoting *Franks,* 438 U.S. at 171, 98 S.Ct. 2674). Moreover, the Second Circuit had not conclusively defined the reckless disregard standard until its recent decision in *United States v. Rajaratnam,* issued while this decision was pending. *See id.* (noting that the Second Circuit had not "conclusively defined 'reckless disregard' "); *see also Vilar,* 2007 WL 1075041, at *26 ("[T]he Court has been referred to no Second Circuit case, nor is it aware of one, that explicitly defines what it means to recklessly disregard the truth in the *Franks* context."). In *Rajaratnam,* the Second Circuit confirmed that a subjective test governs the recklessness inquiry. *See Rajaratnam,* 719 F.3d at 153 ("[The recklessness] inquiry, which looks to the mental states of mind of government officials, is said to be a 'subjective' test rather than an 'objective' one.") Accordingly, in the case of both intentional and reckless falsehoods, a defendant must show that "the intent" behind "the misstatement or omission [was] ... to mislead the judicial officer into approving the requested warrant." *Vilar,* 2007 WL 1075041, at *25. Furthermore, it is well established that "[a]n inaccuracy that is the result of negligence or innocent mistake is insufficient." *Id.* (alteration in original) (internal quotation marks omitted).

"As might be expected, the guideposts for determining recklessness are different when evaluating" misrepresentations and omissions. *Rajaratnam,* 2010 WL 4867402 at *9. In the context of the former, courts generally ask whether the affiant "made a false statement with knowledge that the statement was false"; "had a serious doubt as to the truth of the state-

ment when [he or she] made it"; or "had obvious reason to doubt the veracity of the statement." *Id.* (brackets and internal quotation marks omitted); *see also Vilar,* 2007 WL 1075041, at *26 ("[M]ost circuits that have considered the question have embraced a subjective test for recklessness ... that one 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations."). In the context of reckless omissions, courts in the Second Circuit have generally asked "whether the omitted information was clearly critical to assessing the legality of the search." *Rajaratnam,* 2010 WL 4867402, at *9; *see also Vilar,* 2007 WL 1075041, at *27 (explaining that "recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination" (citing *Rivera v. United States,* 928 F.2d 592, 604 (2d Cir.1991))).[11]

The Second Circuit recently clarified, however, that while recklessness may be inferred circumstantially, *see Rajaratnam,* 719 F.3d at 154 ("Of course, the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information in an ... application." (emphasis in original)), a showing that omitted information was "clearly critical" is not, by itself, sufficient to establish that a government affiant acted with reckless disregard for the truth, *see id.* at 154 ("A wiretap applicant does not *necessarily* act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'"); *see also id.* at 154–55

(finding that district court erred in finding recklessness, where the court's "view that the [omitted information] was 'clearly critical' [was] the *only basis* for [its] conclusion that the government omitted certain information ... with 'reckless disregard for the truth'" and instructing courts to consider *"all* of the evidence presented at the *Franks* hearing" (first emphasis added) (second emphasis in original)). Instead, a court must consider the full record—"especially the *Franks* hearing testimony regarding the states of mind of the government agents," *id.* at 156—and find "credible and probative evidence that the omission of information in a[n] ... application was designed to mislead or was made in reckless disregard of whether [it] would mislead," *id.* at 154 (third alteration in original) (internal quotation marks omitted).

In sum, "to the extent [the Moving Defendants] believe that [the affiants] exercised poor judgment in not considering to include [certain] information, that would, at best, support a claim of negligence. [And], such a finding ... would not get [them] over the first *Franks* hurdle." *Vilar,* 2007 WL 1075041, at *29; *see also Rajaratnam,* 719 F.3d at 155 (finding that the district court's "inference" of recklessness was "particularly inappropriate where the government [came] forward with evidence indicating that the omission resulted from nothing more than negligence"); *id.* (relying on *Franks* testimony that the affiant omitted information, where she testified that "it never occurred to [her], never crossed [her] mind to" include the omitted information, "[because] [she] didn't think

---

11. The Court notes that "[t]here is some disagreement among the Courts of Appeals, and," until recently, there was disagreement within the Second Circuit, on the question of "whether recklessness can be established where a reasonable affiant would know that omitted information would be important to the reviewing court." *Rajaratnam,* 2010 WL 4867402, at *9 n. 13. For the viewpoint contrary to the Second Circuit's, *see Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir.2000) (citing *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir.1993)).

about" that information as relevant to the allegations in the affidavit (alterations in original)).

■ With respect to the materiality requirement, the Moving Defendants must demonstrate by a preponderance of the evidence that the misrepresentations or omissions in the search warrant affidavits were "necessary to the [issuing] judge's probable cause finding." *Canfield,* 212 F.3d at 718; *see also Southerland,* 681 F.3d at 127 (same). To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause. *See Rajaratnam,* 719 F.3d at 146–47 (explaining that courts correct errors in an affidavit to determine if probable cause exists based on a hypothetical corrected affidavit, and further noting that, in the context of omissions, courts "insert the omitted truths" into the hypothetical corrected affidavit (internal quotation marks omitted)); *Southerland,* 681 F.3d at 127 (explaining that courts correct errors in an affidavit to determine if probable cause still exists); *Canfield,* 212 F.3d at 718 ("If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination[,] and suppression is inappropriate."); *see also Dupree,* 781 F.Supp.2d at 146 (same); *United States v. Mandell,* 710 F.Supp.2d 368, 374 (S.D.N.Y.2010) (same). The Supreme Court has observed that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts," and has endorsed a "totality-of-the-circumstances approach" to probable cause. *Illinois v. Gates,* 462 U.S. 213, 232, 230, 103 S.Ct. 2317, 76

L.Ed.2d 527 (1983); *see also United States v. Falso,* 544 F.3d 110, 117 (2d Cir.2008) (same).

### 2. *Santiago's Motion*

By counsel and in his *pro se* submissions, Santiago argues that the evidence found at his home must be suppressed, because the Santiago Affidavit contains intentional or reckless, material misrepresentations and omissions. Santiago's primary argument is that the Santiago Affidavit presents a misleading story about the Lahey Party: Santiago arrived at the Lahey Party "with his 'old lady'"; he was "introduced to the undercover"; he "head[ed] into the bedroom with th[at] woman"; and he "[left] the bedroom" approximately forty-five minutes later. (Supplemental Mem. of Law in Supp. of Pretrial Mots. ("Rinaldo Mem.") 3.) Santiago is correct that the affidavit conveys that story. (*See* GX 201 ¶ 11.) He is also correct that this story does not precisely sync up with the recordings from the Lahey party. But the specific errors in the affidavit (even if intentional or reckless) are not material.

■ At the outset, even if the Court accepts all of the alleged errors that Santiago identifies, the remaining uncontested allegations in the Santiago Affidavit are sufficient to establish probable cause to search his residence. Santiago does not challenge the following allegations: First, Doc told the UC that Mongols were bringing drugs to the party, (*id.* ¶ 11(a)); [12] second, the UC observed Santiago, whom he learned to be the President of a Mongols chapter, arrive and walk into Lahey's house, escorted by at least one woman carrying a bag, (*id.* ¶ 11(c)-(d)); [13] and

---

12. The audio recordings and the Kotchian Report support this allegation. (*See* Gov't Session 9, at 10; Gov't Ex. 300 ("GX 300"), at 5.)

13. There is no recording of this event, but it is detailed in the Kotchian Report, (GX 300, at 5–6), and Santiago does not challenge the substance of these paragraphs, except in rela-

third, later, the UC observed several Mongols' and/or their companions' possessing, packaging, and distributing the cocaine, (*see id.* ¶ 11(f)-(h)).[14] These allegations establish probable cause to believe that Santiago was engaged in drug activity. *Cf. United States v. Valentine*, 539 F.3d 88, 94 (2d Cir.2008) (finding probable cause lacking where, "[t]he undercover officers had never met" the individuals who delivered the drugs "before they arrived ... and *had no information from which they could conclude that [the defendant] was involved in the sale of narcotics*" (emphasis added)). Santiago also largely does not challenge the allegation that the UC gave money to Doc for cocaine; the UC observed Doc deliver that money to Lahey, who handed it to Santiago; and the UC then received cocaine from Lahey. (GX 201 ¶ 11(e).)[15] This allegation also establishes probable cause to believe that Santiago was engaged in drug activity at the party. *See Morales v. Greiner*, 381 F.3d 47, 47–48 (2d Cir.2004) (per curiam) (finding probable cause based on the fact that "[o]n four separate occasions, [the suspect] 'touched hands' with another individual, entered [a] vestibule of a building with that person, engaged in some sort of transaction, and then quickly exited"); *see also United States v. Blocker*, 269 Fed.Appx. 117, 119 (2d Cir.2008) (explaining that an "undercover officer's ... observations, as well as his experience, transformed ... suspicion into probable cause").

The Court's inquiry could end there.[16] But Santiago has identified several errors

tion to the number of individuals with whom he arrived, which challenges are discussed below.

14. The audio recordings go even further; there is a clear recorded conversation in which Doc unambiguously confirms that the Mongols brought the cocaine to the Lahey Party, and in which he arguably confirms that Santiago specifically brought the cocaine to the Party. (*See* Gov't Session 11, at 14 (conversation between Doc and the UC, in which Doc says that the women in the bedroom are "Mongol's [or Mongols'] old ladies" and that "[t]hey're the ones who brought everything"; the UC asks "Oh COMANCHE? ... how's he man?"; and Doc answers "COMANCHE's a rock solid motherfucker").) For immediate purposes, the Court interprets Doc's statement, at a minimum, to confirm that the Mongols brought the cocaine.

15. In his *pro se* submissions, Santiago asks how the UC could have observed the hand-off between Lahey and Santiago, both of whom were, according to the Santiago Affidavit, in the bedroom behind a closed door at this point. But Santiago's rhetorical question does not prove either that this hand-off did not occur or that the UC did not observe it. As will be discussed below, it is now clear that Santiago was not in the bedroom for an uninterrupted forty-five minute period after arriving; he was walking in and out of the bedroom. Therefore, the UC could have observed the hand-off when Santiago was not in the bedroom. Moreover, the Santiago Affidavit states that "[t]he UC handed [Doc] $250 in cash," and the UC then "saw [Doc] hand the money to LAHEY. The UC *subsequently* observed LAHEY hand an amount of cash to SANTIAGO." (GX 201 ¶ 11(e) (emphasis added).) One could read the last sentence as occurring at some point after the period in which Santiago was allegedly in the bedroom.

16. As noted, these uncontested allegations, which survive into the hypothetical corrected affidavit, establish probable cause that Santiago was engaged in drug activity. But the question of whether there was probable cause to believe that he was a drug dealer is potentially distinct from the question of whether there was probable cause to search his apartment. *See United States v. Cardoza*, 713 F.3d 656, 659 (D.C.Cir.2013) (explaining that, following a *Franks* hearing, the question of whether the search warrant affidavit created probable cause to search defendant's apartment broke down into "subsidiary questions: [f]irst, was there probable cause to believe [defendant] was engaged in drug trafficking[,] ... [a]nd second, if so, does that create probable cause to search his apartment"); *see also United States v. Kortright*, No. 10–CR–0937, 2011 WL 4406352, at *8–9 (S.D.N.Y. Sept. 13, 2011) (describing the "existing disagreement"

in the Santiago Affidavit—whether they be described as misrepresentations or omissions—that merit discussion. The Court ultimately concludes that these errors fail to merit suppression.

First, Santiago argues that the affidavit erroneously conveys that the UC was introduced to Santiago immediately upon the latter's arrival at the party. Santiago is correct that the affidavit suggests an immediate introduction. And at the *Franks* hearing, the Government seemed to concede that the affidavit is inaccurate in this respect.[17] Indeed, Special Agent DiGirola-

mo specifically testified that the affidavit would be more accurate if the second clause of Paragraph 11(c) were moved to the end of 11(d) to convey that the UC met Santiago at some later point at the party. (Hr'g Tr. 110–14, Oct. 1, 2012; *see also* Gov't Mem. 25.) But Defendant's argument that "[t]he fact that the undercover was not introduced to [Santiago] upon his arrival calls into question whether or not the undercover ever observed [Santiago] allegedly in possession of a shotgun," (Rinaldo Mem. 4), strains credulity. And the timing of when the UC and Santiago were

---

within the Second Circuit as to whether "the mere fact that a narcotics trafficker lives in an apartment is a[ ][ ]sufficient basis to search the apartment" (internal quotation marks omitted)).

Courts in the Second Circuit have generally avoided addressing whether an officer's reasonable belief that an individual is a drug dealer necessarily amounts to probable cause to search his or her residence in cases in which there was a search warrant by relying on the good-faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See, e.g., Kortright*, 2011 WL 4406352, at *9 & n. 10 (documenting that, in multiple decisions, courts have "declined[, based on *Leon's* exception to the exclusionary rule,] to suppress ... seized evidence" from a residence, where probable cause to search was based solely on a law enforcement officer's belief that the resident was a narcotics trafficker). That approach is trickier here, because the *Leon* exception normally does not apply where the underlying search warrant affidavit contains false statements or omissions that are intentional or reckless and material. *See Leon*, 468 U.S. at 923, 104 S.Ct. 3405 (citing *Franks*); *see also United States v. Perez*, 247 F.Supp.2d 459, 477–78 & n. 9 (S.D.N.Y.2003) (explaining that "*Leon* made clear" that "[i]n the event of a successful challenge under *Franks*, the good faith exception set forth in [*Leon*] does not apply"); *cf. United States v. Gambardella*, No. 09–CR–0130, 2009 WL 5217996, at *4 (D.Conn. Dec. 29, 2009) ("*Franks* and *Leon* stand for the same general principle....").

The Court need not address this issue for two reasons. First, Santiago does not argue that even if the affidavit supports probable cause to believe he was engaged in drug activity it nonetheless fails to establish probable cause to search his residence. Second, the alleged misrepresentations and omissions in the Santiago Affidavit are not material. Consequently, the fact that the affidavit establishes probable cause to believe that Santiago was a drug dealer means that a well trained officer would not have known that he or she might lack probable cause to search Santiago's residence, and the suppression remedy is therefore unavailable to Santiago. *See Kortright*, 2011 WL 4406352, at *9 (declining "to suppress the seized evidence because, under the current state of the law," regarding probable cause to search a suspected drug dealer's residence, "a reasonably well trained officer would not have known that the search was illegal").

17. The Government argues in its Memorandum of Law that there is no error, because "the introduction between Santiago and the UC was not even mentioned in the affidavit relating to Santiago's residence." (Gov't Mem. 32.) The Santiago Affidavit, however, says otherwise. (*See* GX 201 ¶ 11(c) ("That afternoon, members of the Mongols Motorcycle Club arrived at LAHEY's residence, *and the UC was introduced to 'Comanche,'* the president of the Mongols Upstate New York Chapter, who was later identified as [Santiago]." (emphasis added)).)

introduced is otherwise immaterial.[18] The allegation that the UC observed Santiago's arrival and specifically saw Santiago carrying a sawed-off shotgun thus survives Santiago's challenge, and is incorporated into the hypothetical corrected affidavit.[19]

Second, Santiago argues that the affidavit misrepresents that, after arriving, Santiago entered Lahey's bedroom with Doc, Lahey, and a woman, and stayed there for an uninterrupted period of forty-five minutes. Santiago is correct that the affidavit suggests as much.[20] And the Government has conceded that Santiago did not, in fact, stay in the bedroom for forty-five minutes, but instead walked in and out of the bedroom at least one time, and potentially more. (Gov's Mem. 10 & n. 3; see also Hr'g Tr. 78–79, 86–87, Oct. 1, 2012.) Santiago contends that by omitting the fact that Santiago was walking in and out of the bedroom, Special Agent Grunder attempted to establish that Santiago exercised continuous control over the cocaine in the bedroom, which implication was critical to the magistrate judge's finding of probable cause. The Court does not agree. The corrected allegation that Santiago repeatedly entered and exited a private room in which there was a large quantity of cocaine, when combined with the other allegations in the hypothetical corrected affidavit, still supports probable cause to believe that Santiago was involved in a narcotics transaction. See United States v. Heath, 455 F.3d 52, 57 (2d Cir. 2006) (explaining that "those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense," and collecting authority for the proposition that law enforcement officers' observation of drugs in plain view in a home creates probable cause to arrest individuals there).

Third, Santiago argues that the affidavit contains the misrepresentation that he ar-

18. The fact that Special Agent Digirolamo had months to prepare the affidavit is irrelevant to the Court's task. During the interim period, the UC remained undercover and thus might have been incapable of being fully involved in the drafting and editing of the challenged affidavits. Moreover, Santiago does not cite any law for the proposition that an affidavit should be held to a different standard when the affiant had more time to prepare it.

19. Santiago suggests that Paragraphs 11(c) and 11(d) are "suspicious" for two additional reasons. First, he claims that the UC's recorder captured the UC's asking Doc at approximately 4:50 p.m. to identify the women who arrived with Santiago. (See Gov't Session 11, at 14.) Santiago claims that it is inexplicable that the UC saw the women arrive and then later had to ask Doc who the women are. But the fact that the UC inquired as to the identity of the women does not prove that he did not observe their arrival. Second, Santiago claims that the paragraph is suspicious, because it states that "SANTIAGO . . . removed a shotgun from the t-shirt," (GX 201 ¶ 11(d) (emphasis added)), but the Government now appears to claim that Doc uncovered the shotgun on the porch, (Gov't Mem. 9 ("Comanche then walked to the porch area of Lahey's residence and handed the firearm to Doc, who unwrapped it.").) This inconsistency between the affidavit and the Government's instant submission is immaterial, as it does not neutralize the implication in the affidavit that Santiago possessed the shotgun.

20. The Government argues that "[t]he Search Warrant Affidavits do not suggest that Santiago was in the bedroom the entire time or when the drug deal between Lahey and the UC occurred. Quite the opposite, the Search Warrant Affidavits make clear that Santiago was *not* in the back bedroom when the drug deal occurred." (Gov't Mem. 31 (emphasis in original) (citing GX 201 ¶ 11(f)—(g)).) The Court has read Paragraphs 11(f)—(i) multiple times and simply disagrees; Paragraphs 11(f) and 11(g) imply that Santiago stayed in Lahey's bedroom until the UC entered it to purchase drugs, approximately forty-five minutes later.

rived with only "a" woman, when he actually arrived with two men and two women. Here too, Santiago has correctly identified an error in the affidavit. But here too, Santiago attaches too much significance to that error. He claims that "[a]lerting the magistrate to the fact that [Santiago] arrived with four other people including two women would have severely weakened the connection between [Santiago] and the woman who brought the drugs, alleged to be his 'old lady.'" (Rinaldo Mem. 4–5.) Santiago additionally argues in his *pro se* submission that the other two men, both Mongols, could have been the sources of the cocaine at the party. Santiago relatedly argues that it is unclear whether any of the women that Santiago arrived with was his "old lady," or "girlfriend," or was one of his old ladies or girlfriends, as implied by the Santiago Affidavit. (GX 201 ¶ 14(a) n. 2.) The Court agrees that the recording in which Doc refers to the women who arrived with Santiago is arguably ambiguous with respect to whether Doc is identifying the women as the Mongols gang's collective "old ladies" or as Santiago's individual "old ladies." (*See* Gov't Session 11, at 13–14.)[21] But neither the number of people Santiago arrived with nor the nature of his relationships with them is material to probable cause as to Santiago. The Second Circuit has held that an undercover agent's "observation of cocaine and marijuana in plain view throughout an apartment containing six men provided probable cause to arrest all six occupants." *Heath*, 455 F.3d at 57 (citing *United States v. McDonald*, 916 F.2d 766 (2d Cir.1990)); *see also MacDonald*, 916 F.2d at 768, 770. Therefore, even if Special Agent Grunder

had correctly stated in the affidavit that Santiago arrived with two male Mongols and two non-girlfriend female associates of the Mongols, one of whom carried a large bag and was later observed taking part in drug packaging, that statement plus the remaining allegations in the hypothetical corrected affidavit create probable cause to believe that Santiago, too, was engaged in drug activity. *See MacDonald*, 916 F.2d at 768–70 (explaining that probable cause to arrest can extend to multiple individuals who have access to a private room in a residence).

Fourth, Santiago argues that Paragraph 12 of the affidavit mischaracterizes the substance of a conversation between Doc and the UC on May 29, 2010. That paragraph, in relevant part, states that "[Doc] told the UC that [Santiago] had provided the cocaine sold at LAHEY's residence that weekend. [Doc] also told the UC that [Santiago] wanted to sell more 'weight.'" (GX 201 ¶ 12.) The UC's recorder captured Doc saying the following, disconnected things on May 29, 2010: "[D]id I ever tell [you] about the *Mongols* that brought that shit up that day"; So he's bringin' up some shit, I'll have it"; "You know, [Santiago] is (unintelligible) their president (unintelligible). Me and [Santiago] are fuckin' best friends. I mean, every day we see each other, no matter what"; and "[a]n ounce?" (seemingly in reference to a quantity of cocaine). (Gov't Session 5, at 1–4 (emphases added).) The UC's recorder notably did not capture either Doc's identifying Santiago as the specific Mongol who brought the cocaine to the party, or Doc's stating that Santiago could deliver wholesale "weight" of cocaine for them to sell.

---

**21.** Indeed, as further support for Santiago's theory that Santiago had only one girlfriend and that Doc was describing the women who arrived with Santiago as the Mongols' collective old ladies, rather than Santiago's old ladies, Santiago also could have pointed out

that at approximately 1:11 p.m., Doc states specifically that Santiago's singular *"old lady* told me that [something is wrong with that gang member]. She said he doesn't go after old ladies." (Gov't Session 9, at 5. (emphasis added).)

But Santiago's argument regarding this paragraph fails for two reasons. First, Santiago has failed to prove that Paragraph 12 even contains a misrepresentation or an omission. It bears repeating that the Government need not prove the precision of every detail in a challenged search warrant affidavit, because an affiant is entitled to engage in selective storytelling. *See Vilar,* 2007 WL 1075041, at *27. Instead, the burden is on a defendant to demonstrate that a specific statement or detail is false. *See Southerland,* 681 F.3d at 126–27; *Martin,* 426 F.3d at 73; *Canfield,* 212 F.3d at 717–18. Here, Santiago has shown that the partial recordings are, at most, marginally ambiguous with respect to two details that are included in the affidavit—to wit, that Santiago specifically, as opposed to the Mongols generally, brought drugs to the Lahey Party, and that Santiago was capable of moving more "weight" of cocaine. But the recording is not inconsistent with these details, even if it does not bear them out specifically. Second, even if Paragraph 12 does contain misrepresentations or omissions, Santiago has not demonstrated that the errors were the product of Special Agent Grunder's (or any ATF agent's) intent to mislead the magistrate judge or reckless disregard for the truth. The Government has credibly explained both that the UC's recorder did not capture every statement made during the May 29, 2010 conversation, and that the UC specifically conveyed the missing details from this conversation to other ATF agents. Moreover, the Kotchian Reports support the Government's assertions; they document that the UC believed that, on May 29, 2010, Doc identified Santiago as the source of the cocaine at the Lahey Party and as a potential future source of cocaine. (*See* Gov't Ex. 302, at 4.) Special Agent DiGirolamo had no reason to doubt the veracity of the Kotchian Reports or the UC's representations, when he relied on those sources to draft Paragraph 12, and Special Agent Grunder had no reason to doubt the veracity of that paragraph when he swore out the affidavit. Consequently, any errors in that paragraph were not deliberate or reckless.

Fifth, Santiago states that the Court should draw a negative inference from the fact that, in the search warrant affidavit for Lahey's Residence ("the Lahey Affidavit"), Special Agent DiGirolamo described an unnamed "Mongols Member" entering the bedroom with Lahey, (Gov't Ex. 3502–F ¶ 12(c)-(d)), whereas in the Santiago Affidavit, Special Agent Grunder identified Santiago as the Mongol entering the bedroom by name. Santiago suggests that when Special Agent Grunder swore out the Santiago Affidavit, Santiago had become a "convenient target as the president of the Mongols." (Rinaldo Mem. 6.) Santiago expands on this argument in his *pro se* submissions by pointing out additional differences between the Tarrats and Santiago Affidavits, on the one hand, and the Lahey Affidavit on the other. These arguments are unpersuasive. The fact that the Government chose to include different information in different search warrant affidavits is hardly surprising, and the Government's "[selective] storytelling" does not call into question the validity of either affidavit, *see Vilar,* 2007 WL 1075041, at *27.

Finally, both Moving Defendants attach significance to the fact that only some events were captured by the UC's recording device. They argue that the gaps in the recordings coincide with critical events in the challenged affidavits, and that the Court should accordingly hold the affidavits to a higher degree of scrutiny. But the gaps in the partial recording are a red herring. Special Agent DiGirolamo persuasively offered neutral explanations for these gaps: The recording device had a

limited battery; the device had limited memory; the UC could not always inconspicuously turn the device on or off; and the UC could not always inconspicuously verify whether it was on or off. (Gov't Mem. 4 & n. 1; *see also* Hr'g Tr. 37–38, Oct. 1, 2012.) Moreover, courts generally have held that gaps in audio recordings, without more, are not constitutionally significant. *See United States v. Myers,* 527 F.Supp. 1206, 1231 (E.D.N.Y.1981) (explaining that allegations that "not every conversation ... was preserved in a recording" did not demonstrate "a constitutional defect" but could be used as "an argument to the jury as to the credibility of the government's case"); *accord United States v. Dawson,* 425 F.3d 389, 392–93 (7th Cir.2005) (explaining that "tapes" in which "some words were unintelligible," in which there were "gaps"—because "the signal from the transmitter was interrupted" and because the informant "failed to start his recorder"—and in which "[t]here may also have been erasures" were still admissible, and noting that the fact that the gaps might include exculpatory information did not give rise to a *Brady* violation).

In short, Santiago has failed to demonstrate that the alleged errors in the Government's presentation of information to the Grand Jury on August 24, 2010, August 26, 2010, or August 2, 2011 was prejudicial, or that any misstatements or omissions in the Santiago Affidavit were intentional, reckless, or material. Accordingly, his Motion to suppress is denied.

### 3. Tarrats's Motion

As the Court has previously noted, the Tarrats Affidavit, sworn out by Special Agent DiGirolamo, in relevant part, tracks the Santiago Affidavit. (*Compare* GX

3502–G ¶ 11, *with* GX 201 ¶ 11.) Tarrats argues that various allegations in the Tarrats Affidavit misrepresent his role at the Lahey Party, and he further argues that the Tarrats Affidavit does not include information which would have undermined probable cause to search his residence.[22]

#### a. Connection to Drugs

Tarrats's strongest argument is that Special Agent DiGirolamo both misrepresented the sequence of events of the Lahey Party in Paragraph 11 of the Tarrats Affidavit and omitted certain other information in order to create the impression that Pagans officers set up guard duty at the Party for the express purpose of protecting drug deals that were going to take place. In so doing, Tarrats argues, Special Agent DiGirolamo connected Tarrats, by virtue of the latter's serving on guard duty, to those drug deals, when, in actuality, Tarrats had no knowledge that drugs were being brought to Lahey's house or were being used or sold there.

#### i. The Errors and the Hypothetical Corrected Affidavit

Specifically, Tarrats first claims that Paragraph 11 contains a misrepresentation insofar as its order suggests that Doc and the UC had a conversation about a drug deal *before* Doc showed the UC the location of various guns, and *before* Doc and Roadblock set up guard duty, (*see* GX 3502–G ¶ 11(a)-(c)), when, in actuality, Doc and the UC discussed the drug deal, (Gov't Session 9, at 10 (recording of UC and Doc discussing sale of cocaine to the UC at 1:30)), *after* Doc had taken the UC on the security tour, (Hr'g Tr. 43–44, Oct. 1, 2012 (Special Agent DiGirolamo's testimony that the unrecorded security tour took place when the UC first arrived); Gov't

---

**22.** Tarrats makes the same arguments for dismissal and for suppression. The Court addresses them as *Franks* arguments, because,

for reasons that the Court will explain, suppression is appropriate, but dismissal is not.

Ex. 300 at 5 (Kotchian Report documenting that UC arrived at Lahey's at 12:00 p.m.), and *after* Doc and Roadblock had set up guard duty, (Gov't Session 7, at 2–10 (recording of Roadblock, Doc, Davis, and the UC discussing guard duty assignments at approximately 12:20–12:30 p.m.)). The Government concedes that the Tarrats Affidavit would have been accurate if Paragraphs 11(a) and 11(b) were flipped, (Gov't Mem. 24), but claims that if Paragraph 11(a) and 11(b) were switched, Paragraphs 11(a) and 11(c) would not need to be changed to be in an accurate sequential order, (Gov't 2d Mem. 14–15; *see also* Hr'g Tr. 201–02, Oct. 1, 2012). The Court disagrees in at least one respect. The first sentence of Paragraph 11(c)—"[t]hat afternoon, [Doc] and [Roadblock] arranged for a security assignments [sic] for the Pagans gathering," (GX 3502–G ¶ 11(c))—*must* be placed prior to Paragraph 11(a), because Doc and Blair set up guard duty prior to the relevant conversation between Doc and the UC about drugs. (*See* Gov't Session 7, at 2 (beginning of recording of Roadblock's and Doc's setting up guard duty assignments at approximately 12:20 p.m.); Gov't Session 9, at 10 (recording of UC's and Doc's discussion of drugs at approximately 1:30 p.m.).) [23] The second sentence in Paragraph 11(c)—"[t]he UC saw [Doc] put a High–Point rifle in the front seat of a pick-up truck located at one of the two security check-points, and [Doc] told the UC that a second rifle was placed at the second security checkpoint," (GX 3502–G ¶ 11(c))—occurred between 2:08 and 2:45 p.m., (Hr'g Tr. 72–73, Oct. 1, 2012), forty minutes to just over an hour after the operative conversation about drugs took place.

In other words, the hypothetical corrected affidavit reads as follows:

a. In the morning, Doc showed the UC multiple firearms that were located inside Lahey's residence, including a shotgun with a shortened barrel above the front door of the Residence; a shotgun with a shortened barrel inside a bedroom of the Residence; a High–Point 9 millimeter rifle; and a small caliber handgun in Lahey's waistband, among others. Doc and Roadblock then arranged for a security assignment for the Pagans gathering.

b. Approximately an hour later, Doc told the UC that members of the Mongols would be coming to the party and would be bringing cocaine to sell. Doc asked the UC if the UC wanted to purchase some cocaine. The UC told Doc that he wanted to buy an "eight ball" and two 1–gram bags of cocaine. Doc told the UC that he would let the UC know the price for the cocaine.

c. Between thirty minutes and an hour later, the UC saw Doc put a High–Point rifle in the front seat of a pick-up truck located at one of the two security checkpoints, and Doc told the UC that a second rifle was placed at the second checkpoint.

Tarrats argues that this misrepresentation is significant, because, by changing the sequence of these events, Special Agent DiGirolamo created the misleading impression that Doc and Roadblock set up guard

---

23. Doc and the UC briefly discuss cocaine at 12:27 p.m., (Gov't Session 7, at 8), but it is abundantly clear that this brief exchange is not the conversation described in Paragraph 11(a) of the Tarrats Affidavit. Paragraph 11(a) describes a conversation in which Doc makes specific reference to the Mongols' bringing drugs, and in which Doc tells the UC that he will know the price of the drugs later in the day. (*See* GX 3502–G ¶ 11(a).) The partial recordings confirm that this specific conversation occurred at 1:30 p.m., after Doc and Roadblock had arranged guard duty assignments. (*See* Gov't Session 9, at 10.)

duty expressly to protect the drugs that the Mongols were transporting.

Tarrats further claims that Special Agent DiGirolamo also omitted known information which, if included in Paragraph 11, would have severed the implied link between Tarrats's guard duty assignment and the drug deal between Doc and the UC. For example, Tarrats claims that Special Agent DiGirolamo omitted the fact that all of the conversations about drugs between Doc and the UC were expressly private and distinct from their conversations regarding official Pagans activities. (*See* Gov't Session 9, at 25–27 (recording of conversation between UC and Doc about keeping the drug deal "quiet" and "as anonymous as possible"); Gov't Session 5, at 4 (recording of May 29 conversation between UC and Doc in which the UC says that their joint drug dealing is "not club business").) Tarrats additionally notes that Special Agent DiGirolamo omitted *many* statements, captured by the UC's audio recorder, which demonstrate that Roadblock, the Pagans' Sergeant at Arms who was responsible for club security, set up guard duty for the non-drug related, Pagans-specific purpose of protecting special guests at the party—i.e., a mother club member, and a President of Presidents ("a POP")—and was generally opposed to Pagans-sponsored drug activity.[24] (*See* Gov't Session 7, at 2–3 (recording of Roadblock stating that there should be "fuckin' people on guard duty" because there's a "[President of Presidents] and a Mother Club member" present); *id.* at 3 (recording of Roadblock explaining that guard duty needs to start because "you've got a Mother Club member and a [President of Presidents] here"); Gov't Session 10, at 14 (recording of Roadblock stating "you ask any of the guys in my fuckin' ah chapter, I'm an SA and I tell 'em, listen you wanna do drugs, you wanna do whatever the fuck, that's your business[, b]ut when it affects you bein' a good Pagan, then it becomes my problem and I will solve it—and I will straighten it out"); *id.* at 15 (recording of Roadblock stating "[t]ake care of business and then you party"); Gov't Session 5, at 4 (recording of May 29 conversation between UC and Doc in which the UC says that, if Roadblock finds out that they are planning to buy more drugs to sell, "ROADBLOCK will fuckin', will go ape shit").) Additionally, Tarrats argues that Special Agent DiGirolamo omitted information about the size of the party—the number of guests, the live band and the sound system, the size of the property, etc.—to create the false impression that this was a small house party, not a larger outdoor festival, thus implying to the magistrate judge who reviewed the Tarrats Affidavit that every Pagans member knew about the drug transactions taking place.[25]

---

**24.** Before the Grand Jury, Special Agent DiGirolamo's testimony was inconsistent on this point. When asked about the purpose of guard duty, he initially explained, "Well [Roadblock] and [Doc] had a conversation that there was going to be a mother club member, which is one of the high-ranking members of the Pagans, and a POP, which is the President. The President is like a local bigwig present. So they had to at least—they had to maintain security for that." (GX 3502–A, at 17–18, Aug. 24, 2010.) Special Agent DiGirolamo reiterated moments later that protecting the mother club member was "one of the purposes" of guard duty. (*Id.* at 20.) It was only after a break of approximately fifteen minutes that Special Agent DiGirolamo further clarified upon prompting that guard duty "also . . . protect[s] any activity that's going on within the event, such as drug usage, drug dealing, and stuff like that, any illegal activity." (*Id.* at 35.)

**25.** The Court does not find Tarrats's argument about the size of the Lahey Party persuasive, insofar as it is based on the fact that the Lahey Affidavit contains more details about Defendant Lahey's premises than the

The Government counters that to the extent that the sequencing misrepresentation and the related omissions "suggest that guard duty was set up to protect drug deals, that is not misleading; it is true." (Gov't Mem. 25 n. 8.) But there is an inadequate factual record to support this proposition. There are no statements to that effect in the partial recordings, and there is nothing in the Kotchian Reports reflecting the UC's impressions that guard duty was related to drug dealing at Pagans events. Furthermore, insofar as the Government's theory is that the Pagans specifically set up guard duty to protect the Lahey Party from police interference, their theory is belied by the record. While setting up guard duty, Doc expressly stated that the police knew the Lahey Party was "a friendly party, so they've backed off." (Gov't Session 7, at 6.) The Government falls back on an invitation to use common sense: The outlaw motorcycle gang's guard duty system, it protests, obviously must have been set up, at least in part, to protect criminal activity. In this instance, however, the evidence does not bear out the intuition or specifically demonstrate that the guards on duty knew that they were protecting a drug deal.

The hypothetical corrected affidavit thus contains the additional information that Doc's and the UC's discussions regarding drugs were about a private, non-Pagans affiliated drug deal; that at least one Pagans officer responsible for guard duty was opposed to the intermingling of Pagans and drug-related business; that guard duty was organized for the express purpose of protecting VIP guests at the Lahey Party; that the party was a large

Tarrats Affidavit—or insofar as it is based on the Government's alternating use of the words "premises," "property," and "residence" to describe the venue of the Lahey Party in the different affidavits. As already noted, the Government is entitled to include different information, and to use different nouns, in different search warrant affidavits, and it has provided a plausible explanation for why it did so in this specific instance: It included more detail in the Lahey Affidavit about the nature of Lahey's property, because it was seeking permission to search the entire premises for the body of a murder victim, which had allegedly been buried somewhere on the property. The Court will thus consider Tarrats's argument about the size of the party, only insofar as it is based on omitted information regarding the number of guests, the nature of the party, and the layout of the security points and distances between the residence and those check points. But even these omissions are potentially reckless and material. *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.1996) (finding omissions in a search warrant affidavit to be material and " 'clearly critical,' " such that recklessness could be inferred, where the affidavit "presented only a bare-bones description of [defendant's] land"; where the affidavit "gave no description of the cottage, pond, gazebo, or other characteristics" of the relevant part of the property in which marijuana plants had been observed; and where "information about the distances involved, the layout conditions, and other like particulars of [defendant's] land was crucial").

The Government argues that an issuing judge could infer the size of the Lahey Party from the introduction of Paragraph 11 of the Tarrats Affidavit. (*See* Gov't 2d Mem. 10–11; *see also* GX 3502–G ¶ 11 (describing the event on May 22 as a "Pagans gathering . . . where numerous other members of the Pagans were present, including, among others: CUEVAS, LAHEY, [Doc], [Roadblock], TARRATS, and LEGG").) There are two problems with this argument. First, only six names follow the phrase "including, among others." The reviewing magistrate judge is thus unlikely to have inferred that there could have been between thirty and one hundred guests, which the fuller record suggests was closer to the actual range. Second, "[t]he proper way to put the [issuing] judge on notice" of the size of the Lahey Party would have been to indicate, exactly or approximately, the number of guests, "not to expect a busy [magistrate] judge to read into a tangentially related statement" that one hundred guests possibly attended, *United States v. Simmons*, 771 F.Supp.2d 908, 919 (N.D.Ill.2011).

outdoor gathering with as many as 100 guests; and that guards were not posted immediately outside of the residence itself.

### ii. Recklessness

The Court first considers whether the sequencing misrepresentation and the related omissions were intentional or the product of the affiant's reckless disregard for the truth. This is the close call. At the outset, the Court found Special Agent DiGirolamo's testimony that any errors in the Tarrats Affidavit were not intentional to be facially credible. (Hr'g Tr. 35, Oct. 1, 2012.) Indeed, there is no direct evidence to the contrary, and even in granting the *Franks* hearing in the first place, the Court was more concerned with the possibility that inaccurate information from the UC had been recklessly, rather than deliberately, conveyed to the magistrate judges. (Hr'g Tr. 51, July 25, 2012.) The Court therefore limits its inquiry to whether the sequencing misrepresentation and the related omissions demonstrate reckless disregard for the truth.

■ As noted, to be considered reckless, a misrepresentation must have been made by an affiant who had "knowledge that the statement was false"; "had a serious doubt as to the truth of the statement when [he or she] made it"; or "had obvious reason to doubt the veracity of the statement." *Rajaratnam*, 2010 WL 4867402 at *9 (internal quotation marks omitted); *see also Vilar*, 2007 WL 1075041, at *26. "[A]n inaccuracy that is the result of negligence or innocent mistake is insufficient." *Vilar*, 2007 WL 1075041, at *25 (internal quotation marks omitted); *see also Rajaratnam*, 719 F.3d at 154–56 (explaining that

district court erred in inferring recklessness, where the record evidence, including the affiant's *Franks* testimony, pointed in the direction that errors were the result of negligence). To be sure Special Agent DiGirolamo either had knowledge that his sequencing of Paragraphs 11(a)-(c) was false, or he had obvious reason to doubt the veracity of his sequencing. As he testified, he based the affidavits on his review of the Kotchian Reports and the UC's partial recordings, (*see* Hr'g Tr. 20–21, 30, 119, Oct. 1, 2012), which sources clearly demonstrate that Doc took the UC on a tour of the Lahey property, *then* Doc and Roadblock set up guard duty, *then* Doc and the UC had a private discussion about a drug deal, *and then* Doc set up rifles at the security check points. Be that as it may, however, this error, taken in isolation, has a negligent feel to it—especially given the temporal proximity of the relevant events. (*See id.* at 178 (Special Agent DiGirolamo testimony that he did not know "why [he] put [the subparagraphs] in that order").)

■ To determine whether the related omissions were made with reckless disregard for the truth, the question is whether there is "credible and probative evidence" which allows the Court to infer that the affiant omitted the information with "reckless disregard [to] whether [the omissions] would mislead." *Rajaratnam*, 719 F.3d at 153–54. The Court may consider whether the omitted information was "clearly critical" to probable cause, but that consideration cannot be the "only basis" for concluding that a government affiant omitted information recklessly. *Id.* at 154–55.[26]

---

**26.** As the Court will explain, the sequencing misrepresentation and the omitted information—i.e., that Doc's and the UC's conversations about drugs were private and expressly non-gang affiliated; that Roadblock was opposed to Pagans-sponsored drug dealing at

Pagans events; that guard duty was set up to protect VIP guests; that the Lahey Party was a large outdoor event, attended by dozens and potentially one hundred guests, and featured a tent, a band, and a large sound system; and that guards were not set up immediately out-

Furthermore, the Court is not to consider whether "a reasonably prudent person would have appreciated [the omitted information] given the attendant circumstances," *Vilar*, 2007 WL 1075041, at *27; *see also Rajaratnam*, 719 F.3d at 154–55 (finding that an inference of recklessness "is not to be automatically drawn simply because a reasonable person would have included the omitted information"). With these principles in mind, the Court turns to the record.

 As instructed by *Rajaratnam*, the Court starts with Special Agent DiGirolamo's testimony. *See Rajaratnam*, 719 F.3d at 154–56 (weighing the affiant's and prosecution team's explanation for omissions in the challenged affidavit). Based on that testimony, the Government has presented intuitively appealing arguments as to why each of the omissions was merely negligent. Special Agent DiGirolamo "did not even think to include . . . . details [about the size of the property or the party,] because they seemed so insignificant to him," and he would sign an affidavit to that effect. (Gov't 2d Mem. 11–12 & n. 8.) [27] Special Agent DiGirolamo may not have alleged that the drug deal between the UC and Doc was private, but he did testify that other drug deals occurred at the party. (Hr'g Tr. 44–45, 159–60, Oct. 1, 2012 (Special Agent DiGirolamo's testimony that drug use and distribution is common at Pagans events and occurred at the

Lahey Party); *see also* Gov't 2d Mem. 16.) Special Agent DiGirolamo testified that he included "information that was necessary to support probable cause" but did not include "everything in the case," lest the affidavit be "hundreds of pages long." (Hr'g Tr. 120, Oct. 1, 2012.) The Government also claims that Special Agent DiGirolamo did not intend to hide the ball on Roadblock's hostility to drug dealing—if he had so intended, he would have "omitted [Roadblock's] involvement altogether." (Gov't 2d Mem. 16.) And with particular respect to the anti-drug dealing statements from Roadblock, Special Agent DiGirolamo testified that he did not think they were significant, because "[Roadblock's] personal beliefs on the club is [sic] not the exact same exact as everybody else's in this [Chapter.]" (Hr'g Tr. 173, Oct. 1, 2012.) Each of these omissions may reflect poor judgment, but not necessarily reckless disregard for the truth. *See Rajaratnam*, 719 F.3d at 154–56 (crediting affiant's testimony that "it never occurred to [her], never crossed [her] mind" to include omitted information (alterations in original)); *Vilar*, 2007 WL 1075041, at *29 (crediting similar testimony from the affiant). The Court also appreciates a unique difficulty confronting the Government here: The UC was unable to confer regularly with his colleagues during the drafting of the affidavits or to swear out the affidavits. (Hr'g Tr. 27, Oct. 1, 2012.)

---

side the house itself—when considered in totality, are material. It remains unclear from the caselaw whether there is any space between omitted information that is material and omitted information that is "clearly critical" to assessing the legality of the search. In any event, however, the Court holds that the omitted information here was "clearly critical," and further finds that this finding is relevant to, but not controlling of, the recklessness inquiry.

**27.** As the Government admits, Special Agent DiGirolamo was never expressly asked why he omitted information about the size of the party; "[t]he Government should have asked that question on redirect, but failed to do so." (Gov't 2d Mem. 12 n. 8.) The Government further represents that "Special Agent DiGirolamo is prepared to provide an affidavit or testify under oath that he did not even think to include [these details] in the first instance because of their insignificance to the probable cause determination." (*Id.*)

But there is also "credible and probative evidence" suggesting that this affiant recklessly, rather than negligently, disregarded whether the Tarrats Affidavit, as presented, would mislead a reviewing judge. For example, there is the obviously problematic fact that the sequencing misrepresentation and each of the related omissions in the Tarrats Affidavit drive in the same direction: establishing a connection between guard duty and the drug transaction, which connection the fuller evidence did not support. Similar circumstances led a district court for the District of Northern Illinois to infer recklessness on the part of a government affiant:

> While the omission of each individual fact may not necessarily lead to the conclusion that [the affiant] acted with reckless disregard for the truth, the cumulative effect of all of the omissions was to eliminate nearly every indicator detracting from [probable cause]. There was nothing left to put the issuing judge on notice of the omitted facts.

*Simmons,* 771 F.Supp.2d at 918. And in this regard, this case is distinguishable from *Rajaratnam,* where "it [was] clear that fully disclosing [the omitted information] would only have *strengthened* the . . . application[ ]." *Rajaratnam,* 719 F.3d at 155 (emphasis in original); *see also id.* (finding that the district court's inference of recklessness was particularly inappropriate, "where the information omitted would only have further supported the government's position").[28] Furthermore,

the Court has previously cited the varied and, at times, unsupportable testimony that Special Agent DiGirolamo offered to the Grand Jury specifically regarding the connections between individuals on guard duty and drug dealing at the party. (*See* GX 3502–A, at 14, 17, 20, 35, Aug. 24, 2010 (SA DiGirolamo's testimony regarding the different purposes of guard duty).) And finally, the Court is troubled by the fact that the other allegations in the Tarrats Affidavit amount to little more than generalities about the Pagans, demonstrating that the sequencing misrepresentation and the related omissions were clearly critical to the magistrate judge's determination.

The relevant evidence—Special Agent DiGirolamo's testimony at the *Franks* hearing, the other record evidence including his Grand Jury testimony, and the related, clearly critical nature of the sequencing misrepresentation and the above-cited omissions in the Tarrats Affidavit—leads the Court to find that recklessness is to be inferred. *See Reilly,* 76 F.3d at 1280 (inferring recklessness, where the affiants "fail[ed] to provide *all* potentially adverse information," including details about the size and nature of physical premises, which details were relevant to the validity of the search" (emphasis added)); *Simmons,* 771 F.Supp.2d at 918 (inferring recklessness where the challenged omissions were related and exculpatory); *cf. Rajaratnam,* 719 F.3d at 155–56 (directing that recklessness should not be inferred where omissions are

---

**28.** This case is also distinguishable from *Rajaratnam,* insofar as, in that case, the underlying affidavit was "reviewed by supervisors at the [U.S. Attorney's Office ("USAO")], none of whom thought that [the omitted] information . . . needed to be included." *Rajaratnam,* 719 F.3d at 155. The Government presented no information here regarding whether anyone from the USAO reviewed the challenged affidavits before Special Agents DiGirolamo and Grunder swore them out. There is credi-

ble and probative evidence, however, that members of the prosecution team believed that it was important to establish a connection between guard duty and drug transactions at Lahey's property, which connection was not supported by the record evidence. (*See* GX 3502–A, at 14, 17, 20, 35, Aug. 24, 2010 (SA DiGirolamo's varying testimony regarding the different purposes of guard duty).)

not exculpatory).[29] The Court emphasizes that its holding with respect to recklessness is based on the totality of the evidence—not solely, or even primarily, on its independent determination that the omitted information was "clearly critical," or that a reasonable person would have included the omitted information.

### iii. Materiality

The Court next turns to the question of materiality. Here, the Government faces a steep uphill climb: The hypothetical corrected affidavit is a thin reed on which to base a search of Tarrats's residence—especially for drug-related paraphernalia. (See GX 3502–G ¶¶ 18–23.) Indeed, most problematically, the Tarrats Affidavit, and by extension the hypothetical corrected affidavit, contains very little information specifically regarding Tarrats: It does not contain allegations to the effect that Tarrats brought a weapon to conduct guard duty;[30] that he physically possessed a weapon while on guard duty;[31] that he left the party with a weapon; that he ever entered Lahey's house in general or specifically the bedroom in which the Mongols were allegedly packaging drugs; that he brought drugs to the party; that he possessed or used drugs at the party; that he knew that there were drugs at the party; or that he left the party with drugs.[32] Indeed, so far as the Court can tell, the only allegations in the hypothetical corrected affidavit that support probable cause to search Tarrats's residence are that he is a Pagans member, and that he served on guard duty when there happened to be a drug deal

29. The Court also relies on the Supreme Court's decision in Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). There, the Supreme Court explained that the benchmark for the suppression remedy, including in the context of motions pursuant to Franks, is deterring law enforcement misconduct. See id. at 137, 141–46, 129 S.Ct. 695. Here, there is just enough for the Court to conclude that falsehoods in the Tarrats Affidavit were not the kind of "recordkeeping errors," that were at issue in Herring, see id. at 146, 129 S.Ct. 695, but were, instead, "reckless[ ] or grossly negligent" and thus "sufficiently deliberate that exclusion" will deter such falsehoods in the future, see id. at 144, 129 S.Ct. 695.

30. By way of contrast, the UC and Davis both brought their own pistols for guard duty. (See Gov't Session 7, at 5 (recording of UC stating "[Davis] and I are both got our pistols" to which Doc asks "Oh you've brought 'em?," which the UC answers affirmatively); id. at 7, 10 (recordings of the UC stating that he will keep his gun on him even when not on guard duty).)

31. The Kotchian Reports state that "TARRATS conducted guard duty, while in possession of firearms at a PAGANS OUTLAW MOTORCYCLE GANG party." (GX 300, at 1.)

But there is no such express allegation in the Tarrats Affidavit. At best, one must infer that Tarrats possessed a weapon at some point from the fact that Tarrats conducted guard duty.

32. The Government conceded these points on April 3, 2012, at a previous oral argument. (See Hr'g Tr. 96–105, Apr. 3, 2012) (admissions from the Government, including that "there is nothing in the affidavit that shows by way of observation or even hearsay that Mr. Tarrats was advised that there was going to be a drug deal ... in Lahey's house"; that "[o]ther than the fact that it was discussed at the party and the large quantity [of cocaine] that was there, there is no specific paragraph in the search warrant affidavit that states that [Tarrats] had knowledge that a drug transaction was happening"; that "there is nothing in the affidavit that directly establishes that [Tarrats] even knew there were guns in the truck"; and that "there was no statement in the affidavit that asked the Magistrate Judge to draw [the] inference [that the guns used on guard duty were Mr. Tarrats's guns]" (emphasis added)).) The Government repeated these concessions in its most recent submission. (See Gov't 2d Mem. 17 ("But, the affidavit did not claim that Tarrats knew of the drug transaction between the UC, [Doc], Lahey and Santiago, or of a gun.").)

inside the bedroom within the residence. The Government essentially concedes as much, asserting that "it is not essential that Tarrats knew of the drug deal for purposes of obtaining a warrant to search his residence." (Gov't Mem. 28; *see also* Gov't 2d Mem. 15–16.) According to the Government, probable cause arises from the allegations that "(1) [Tarrats] was a member of the Pagans, (2) the Pagans was a violent gang known to be involved in narcotics trafficking, (3) he was at a Pagans gathering where there were firearms and drug dealing; (3) [sic] the firearms were used for, among other things, to conduct guard duty, and (4) [sic] he conducted guard duty at the party." (Gov't Mem. 28–29.) These five allegations are insufficient to give rise to probable cause to search Tarrats's home.

■ With respect to the first and second allegations, it is important to note that the Government has not filed RICO charges; this case is about firearms and a narcotics conspiracy. Tarrats's membership in the Pagans does not, by itself, establish probable cause to search his residence. *See United States v. Desena*, 260 F.3d 150, 152 (2d Cir.2001) ("[T]he Pagans ... is indisputably an affinity group with purposes and interests that are not predominantly criminal."); *cf. United States v. Moran*, 349 F.Supp.2d 425, 469 (N.D.N.Y. 2005) (finding probable cause based on the following facts: Defendant was a "known Hell's Angel, and Hell's Angels were known to be involved in methamphetamine distribution"; "[m]ultiple telephone conversations took place between" defendant and codefendant, "several of which occurred shortly after" codefendant "made a short trip to Arizona"; an investigator opined that the trip to Arizona was "to obtain methamphetamine" which could be "supplied to several other individuals, including [defendant]"; and codefendant who

traveled to Arizona occasionally visited defendant's residence).

The third allegation on which the Government relies—Tarrats was at a Pagans gathering where there were firearms and drug dealing—is based on a faulty premise of law. The fact that Tarrats was at a gathering in which illegal activity was taking place does not give rise to probable cause to search his residence. By at least one Government estimate, there were close to one hundred guests at the Lahey Party, although there could have been as few twenty. (*Compare* GX 300 at 5 (forty guests), *with* GX 301 at 2 (twenty guests as of approximately 2:00 p.m.), *and* GX 3502–A, at 14, Aug. 24, 2010 (one hundred guests).) At oral argument, the Government wisely retreated from the proposition that there was probable cause to search all of the guests' residences. *Cf. Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause....."). And while there was arguably probable cause immediately to arrest any guest who had entered Lahey's bedroom, *see MacDonald*, 916 F.2d at 768–70, there is, as mentioned, no allegation that Tarrats entered that bedroom, or even the house at all, at any point on May 22.

The Court is unconvinced that the fourth and fifth allegations—firearms were used for, among other things, to conduct guard duty, and Tarrats conducted guard duty at the party—are sufficient to nudge the ball over the line. As mentioned, there is no statement in the Tarrats Affidavit that Tarrats physically possessed a gun while he was on guard duty. The Government is, by its own admission, asking for an inference of constructive possession from the allegations that guns were set up for guard duty and that Tarrats was

on guard duty. But the Government has not explained why, even if the Court were willing to draw this inference, it should control the probable cause determination. Put another way, the Government has not explained why the fact that Tarrats constructively possessed *someone else's* gun while he was on guard duty at *Lahey's property* creates probable cause to search *Tarrats's home* for guns, narcotics, or narcotics paraphernalia. Something more was required. *Cf. United States v. Newton,* 369 F.3d 659, 666 (2d Cir.2004) (holding that a parole officer performed a reasonable warrantless search of a parolee's residence after "the parole officers ... received information that [parolee] had a gun at his residence *and had threatened his mother and her husband*" (emphasis added)); *Trzaska,* 111 F.3d at 1026 (finding that an affidavit supported probable cause to search defendant's home for a weapon, where the affidavit "accurately recounted that [defendant] had received shipments from eighteen weapon supply companies, and that several of the companies confirmed sending firearm and ammunition accessories to [defendant's] apartment"); *Simmons,* 771 F.Supp.2d at 914 (describing a search warrant affidavit for defendant's house that, absent the informant's reliability problems, would have been adequate to justify a search of defendant's home for a gun, because the affidavit stated that the CI had observed defendant possess a specific "blue steel semiautomatic handgun," in a specific location, "beneath a couch in the front room," in that residence (internal quotation marks

omitted)); *United States v. Longhi,* No. 08–CR–0132, 2008 WL 4426806, at *3, *1 (D.Conn. Sept. 26, 2008) (finding "probable cause on the face of [an] affidavit" which included an allegation that a CI had observed " 'several guns, both long and pistol type in [defendant's] residence including ... an Assault Rifle ... [and] a sawed-off shotgun" (internal quotation marks omitted)); *United States v. Waker,* 463 F.Supp.2d 348, 361–62 (W.D.N.Y.2006) (finding that a search warrant affidavit including allegations that one of the residents of the subject property "was wanted on an outstanding state arrest warrant [and] ... had plead[ed] guilty in the past to two state felonies, one involving a crime of violence"; that another individual wanted on an arrest warrant had been taken into custody after exiting the rear of the subject property and had provided a "warning that there were firearms in the [the subject property]"; and that there was "electronic surveillance [on the subject property]" created probable cause). *See generally Florida v. Jardines,* —— U.S. ——, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (reaffirming that "the home" is a constitutional "first among equals").

In short, the five factors that the Government emphasizes do not allay the Court's concern that the search of Tarrats's home was premised on very thin evidence connecting Tarrats (let alone his residence) to the drug deal in Lahey's residence, and the Court accordingly holds that the specific sequencing misrepresentation and the totality of the related omissions are material.[33]

---

**33.** Paragraph 7 of the Tarrats Affidavit states that *"a grand jury in the Southern District of New York returned a twelve count indictment filed under seal[,]* ... [which charged] WALTER TARRATS ... [with] using and carrying firearms in furtherance of a narcotics trafficking conspiracy and unlawfully possessing firearms."* (GX 3502–G ¶ 7 (emphasis added).)

This allegation is uncontested, and there is case law suggesting that the fact the Grand Jury had already returned the Indictment against Tarrats, charging him with participation in a narcotics conspiracy and with unlawful possession of a firearm, without more, supports probable cause to search his residence. *See United States v. Longo,* 70

F.Supp.2d 225, 244, 254–55 (W.D.N.Y.1999) (denying *Franks* hearing, in part, because "Defendant had, prior to [officers'] request for the warrant already been indicted on the instant charges[,] ... [and] the magistrate judge was [thus] confronted with the fact that the Grand Jury had found probable cause to believe Defendant had committed the very crimes to which the search warrant related); *United States v. Percan,* No. 98–CR–0392, 1999 WL 13040, at *4 (S.D.N.Y. Jan. 13, 1999) (finding that "[t]he affidavits relied upon by the magistrate judge issuing the search warrants at issue in this case established probable cause to search the computer, safe, and storage locker" for several reasons, including that "the affidavits reported the issuance of the Indictment and the grand jury's finding that probable cause existed that defendant had committed crimes relating to money laundering and the interstate transportation of stolen airbags"). But Tarrats argues that Special Agent DiGirolamo recklessly or intentionally offered the same inaccurate information in his Grand Jury testimony that he presented in the Tarrats Affidavit.

The Court has reviewed the relevant transcripts of the Grand Jury proceeding *in camera* and agrees that Special DiGirolamo's testimony included several of the same material errors previously discussed. On the one hand, Special Agent DiGirolamo did more accurately describe the size of the Lahey Party to the Grand Jury, testifying that the UC reported that approximately "[one] hundred members of the Pagans" were present (suggesting that he recognized the materiality of this information). (GX 3502–A, at 14, Aug. 24, 2010). On the other hand, Special Agent DiGirolamo's testimony regarding the purposes of guard duty is a significant red flag. As noted, he initially testified that guard duty was set up to protect VIP guests at the party without any mention of a drug deal. (*See id.* at 17–18 (testimony that guard duty was set up because "there was going to be a mother club member[,] ... [and] they had to maintain security for that"); *id.* at 20 (testimony that "[Doc] said that the purpose, or one of the purposes, of the guard duty assignment was because of the presence of a mother club member").) But after a fifteen minute break, he then clarified that guard duty was also set up, at least in part, for the specific purpose of protecting drug deals at the party. (*See id.* at 35 (testimony that guard duty is *"also[ ] to protect any activity that's going on within the event, such as drug usage, drug dealing, and stuff like that, any illegal activity* (emphasis added)).) Special Agent DiGirolamo also problematically testified that everyone at the Lahey Party, presumably including Tarrats, knew that drug dealing was taking place at the Party. (*See id.* at 22 (testimony that "*everybody in the party* was waiting for the Mongols to show up, because *everybody knew* that they were bringing drugs, and I guess *everybody* was waiting for the drugs to arrive" (emphases added)).) There is nothing in the record to support the proposition that guard duty was set up to protect drug dealing; that individual Pagans members who served on guard duty knew of any drug deals; or that all 100 people at the party were waiting for drugs to arrive. Based on these misstatements, the Court holds that the fact that the Grand Jury returned an Indictment is insufficient to uphold the search of Tarrats's residence.

The Court does not, however, dismiss the Superceding Indictment as to Tarrats, because the Government's conduct did not amount to an "outrageous" due process violation. *See Al Kassar,* 660 F.3d at 121. As the Court has explained, based on Tarrats's showing, the errors in the Tarrats Affidavit were reckless, rather than intentional. As the Second Circuit has explained, "negligently inflicted harm is categorically beneath the threshold of constitutional due process," whereas "recklessly inflicted harms are context-dependent closer calls." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 431 (2d Cir.2009) (internal quotation marks omitted)); *see also United States v. Heyward,* No. 10–CR–0084, 2010 WL 4484642, at *5 (S.D.N.Y. Nov. 9, 2010) (explaining that defendant's argument that the indictment should be dismissed because "the government's allegedly negligent oversight of the Informant enabled him to engage in outrageous conduct" was "inconsistent with the centrality of *active, intentional* investigative misconduct to the few decisions in which indictments have been dismissed on due process grounds" (emphasis added)). *See generally Daniels v. Williams,* 474 U.S. 327, 331, 334 n. 3, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (explaining that "[h]istorically, [the] guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property," but further noting that because plaintiff's claim was based on defendant's negligence, the case did not "afford[ ] ... [an] occasion to consider whether ... recklessness ... is

### b. *Tarrats's Remaining Arguments*

Tarrats separately urges suppression on the basis that Special Agent DiGirolamo misrepresented that Tarrats was on guard duty at the Lahey Party, (GX 3502–G ¶ 11(e)), when, in fact, the evidence demonstrates that Tarrats was not on guard duty at the Lahey Party at all. This argument is wholly unpersuasive; there is sufficient evidence that Tarrats was on guard duty, and the allegation in the Tarrats Affidavit to this effect was therefore not an omission or a misrepresentation. At the outset, the Court notes that the Kotchian Reports document that the UC unequivocally reported that he observed Tarrats on guard duty in the shift immediately after the UC's, (GX 300, at 5), and the recorder captured Doc telling the UC that Tarrats was replacing him, (Gov't Session 9, at 24.). Tarrats did not testify at the *Franks* hearing that he was not on guard duty, so there is literally nothing that directly contradicts this allegation.

In an abundance of caution, however, the Court has considered Tarrats's arguments. Tarrats claims, first, that he can be heard on the UC's audio recordings at two different times just outside the house, when, according to the Tarrats Affidavit, he should have been on guard duty at the foot of the driveway, and, second, that it would have been contrary to Roadblock's instructions for Tarrats to have served on guard duty with Legg, as described in the affidavit, because they were members of different Pagans chapters. Neither argument prevails.

With respect to Tarrats's first argument, the Court must initially determine when Tarrats served on guard duty. Paragraph 11(e) of the Tarrats Affidavit states that the UC's guard duty shift ended at approximately 3:00 p.m. The evidence supports this statement and indicates that the next shift, which Tarrats allegedly served, ran from approximately 3:00 until 5:00 p.m. (*See* GX 300, at 5 (Kotchian Report documenting that UC's guard duty ran from approximately 12:30 to approximately 3:00 p.m.); Gov't Session 7, at 3–5 (recording of Roadblock describing the "first round of guard duty ready for one o'clock" and stating that guard duty would run in "two hour increments ya know, starting at one" to be followed by new guards "right away ... for three to five"); Gov't Session 9, at 15–17 (documenting that, at approximately 1:30, the UC and Davis are serving together on guard duty and believe that they have ninety minutes remaining; and further demonstrating that the UC's and Davis's clocks were not synced); Gov't Session 9, at 23 (recording of Roadblock saying that the UC's shift "started a little bit early").) At the *Franks* hearing, however, the Government explained that the UC's shift likely ended at 2:45 p.m., because it was common practice for Pagans on guard duty to be relieved early. (Hr'g Tr. 71–72, 82, 168–69, 202, Oct. 1, 2012; *see also* Gov't Mem. 8, 26.) The Government's current

---

enough to trigger the protections of the Due Process Clause" (emphasis in original)). Based on the circumstances here, the Government's recklessness was not outrageous. First, as the Court will discuss at greater length below, there is sufficient evidence in the record to support the allegations that Tarrats conducted guard duty and constructively possessed a firearm at the Lahey Party. The charges contained in the Indictment and Superceding Indictment corresponding to that conduct are thus untainted. Second, Tarrats has not requested that the Court specifically dismiss the narcotics charges, and the Court is disinclined to do so *sua sponte:* The fact that the Tarrats Affidavit arguably contains insufficient information to establish probable cause to believe that Tarrats engaged in drug dealing activity at the Lahey Party does not establish conclusively that the Government is incapable of proving at trial that Tarrats was involved in a narcotics conspiracy.

position is not inconsistent with the Tarrats Affidavit, which states that Tarrats started at *"approximately* 3:00." (*Id.* ¶ 11(e) (emphasis added).). The Court thus concludes that Tarrats started guard duty between 2:45 and 3:00 p.m., and finished guard duty at some time after 4:45 but no later than 5:01 p.m.

Tarrats claims that he can be heard in the partial recordings at 3:49 p.m. at the house, commenting on the food, and that he consequently cannot have been on guard duty during the 3:00–5:00 p.m. window, as described in the Tarrats Affidavit. (Supplemental Mem. of Law in Supp. of Pre–Trial Mot. To Suppress of Tarrats ("Tarrats Mem.") 4–5 (Dkt. No. 140).) But the snippet of recorded conversation on which Tarrats relies, (Gov't Session 10, at 1–3 (documenting conversation between UC, PROSPECT, and "UNK[NOWN] MALE")), does not prove, by a preponderance of the evidence, that Tarrats was not on guard duty that afternoon. Special Agent DiGirolamo persuasively testified at the *Franks* hearing that neither he nor the UC recognizes the voice at issue to be Tarrats's, and that the unidentified male was more likely a prospect, given the context of the conversation. But even if the Court concluded that the voice is unambiguously Tarrats's, this brief conversation demonstrates merely that Tarrats was at the house, rather than at his check point

by the driveway, at 3:49 p.m. (or thereabout, depending on the recorder's time lag). It does not demonstrate that he was not on guard duty, because there is nothing in the record showing that an individual on guard duty could not leave (or would never leave) his check point for a short duration—for example, for a snack.[34]

Tarrats also claims that the partial recordings include a conversation between the UC and Tarrats time stamped at 4:44 p.m.—fifteen minutes prior to the end of Tarrats's alleged guard duty rotation. (Tarrats Mem. 1–2; *see also* Gov't Session 11, at 8–9.) This snippet of conversation also fails to demonstrate, by a preponderance of the evidence, that Tarrats did not serve on guard duty. Indeed, it is possible that this conversation occurred immediately after Tarrats finished guard duty. The recording device was slow by up to seven minutes, (Gov't Mem. 27), meaning that the UC and Tarrats were actually recorded speaking together at 4:51 p.m., not 4:44. And, as discussed above, the record evidence is consistent with the possibility that Tarrats finished guard duty at 4:51. Moreover, it is possible that this conversation occurred at the tail end of Tarrats's time on guard duty, and there is nothing in the record to suggest either that an individual not on guard duty could not have spoken with an individual on guard duty, or·that an individual on guard duty was

---

**34.** Tarrats cites statements by Defendant Davis to demonstrate that Pagans Members were not allowed to leave guard duty. But the partial recordings are, at most, ambiguous on this issue. At one point, Davis states that he and the UC have only "three thousand, six hundred and ninety [seconds] to go," (Gov't Session 9, at 17), and Tarrats argues that this statement reveals that Pagans Members stayed on duty until the last second. Davis also jokes five or six minutes later about not being able to leave his post to use a bathroom. (*Id.* at 22.) But the partial recordings also reveal that, throughout his time on guard

duty, the UC had multiple conversations with various Pagans members who were not on guard duty, including Doc and Roadblock, (*see, e.g., id.* at 1–2 (conversation between UC and Doc); *id.* at 3–7 (conversation between UC, Roadblock, and Doc); *id.* at 9–15 (conversation between UC and Doc)), and that, at one point, the UC may have stepped away from his check point to make a phone call, (*see id.* at 19 (recording of phone conversation between UC and second undercover in which UC says "I've got ROADBLOCK coming so I'm not gonna be able to talk")).

not allowed to walk away from his post temporarily. To the contrary: The recordings from the UC's time on guard duty suggest that both happened.

Tarrats's second argument is that the allegation in the affidavit that Tarrats served on guard duty must be false, because it states that Tarrats and Legg served on joint guard duty. (Tarrats Mem. 3–4.) According to Tarrats, he and Legg are members of different Pagans chapters, and they thus would not have served on guard duty together, given that Blair was recorded telling Doc that, with respect to guard duty, "as soon as *crews* come up, ... you get with *their* ... [Sergeants at Arms] and sign *them* up ... for two hour increments." (Gov't Session 7, at 5 (emphases added).) Tarrats argues that it "would be more likely that Legg and Crane would be on guard duty together," because they are from the same Pagans Chapter, than that Legg and Tarrats would be on duty together. (Tarrats Mem. 4.) But Blair's statement, read in context, is not an unequivocal command that guard duty shifts should be assigned *only* to pairs from individual Pagans chapters, whereas the UC and Doc made unequivocal statements that Tarrats was on guard duty. Tarrats therefore has not satisfied his burden.

Finally, Tarrats raises some additional arguments, the purposes of which are not readily apparent. For example, Tarrats argues that Special Agent DiGirolamo presented inconsistent information to the Grand Jury and to the Court during the *Franks* hearing regarding whether, at the Lahey Party, the UC had informed both Legg and Tarrats, or just Legg, about the high-point rifle that was set up for security. (Tarrats Mem. 7–8.) Any such inconsistency is immaterial. Tarrats has not demonstrated that Special Agent DiGirolamo's testimony to the Grand Jury regard-

ing this issue was false or prejudicial. Tarrats also argues that the Government has not adequately explained the Government's inconsistent explanations of how the UC simulated using cocaine while he was with Lahey. (*Id.* at 9–10.) This is also immaterial. If Tarrats intended to argue that the affidavit omits the fact that the UC used cocaine, Tarrats has not established that this omission is intentional or reckless, on the one hand, or material on the other. Indeed, Tarrats has not even proved, by a preponderance of the evidence, that there is an omission: Special Agent DiGirolamo offered a persuasive account of the simulation, and the Court finds the differences between the explanations in his testimony and the Kotchian Reports to be minor.

### III. Conclusion

For the reasons stated herein, Defendant Santiago's Motion to dismiss and/or to suppress is denied in its entirety. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 65.) Defendant Tarrats's Motion is granted in part and denied in part. The Superceding Indictment is not dismissed as to Tarrats, but the physical evidence obtained pursuant to the search warrant for his premises is suppressed. The Clerk of the Court is respectfully directed to terminate the pending Motion. (Dkt. No. 69.)

SO ORDERED.